to correct me. I'm mispronouncing your name. Please correct me. You go ahead to take your mask off, please. All right, here's the court. My name is Fabio Castillo, Jr. I'm counsel for defendant, appellant, and in this case, I'd like to reserve five minutes for rebuttal, please. Yes, you've done that. Thank you. This appeal asks whether the government can benefit from the priory replacement of conflict-free counsel. Five months of preparation time in a complex case having a voluminous discovery meaning only a handful of days to prepare for trial due to ignoring its well-established and long-standing duty to promptly, promptly inform the district court of a known conflict with prior counsel, instead choosing to a mere two weeks prior to trial. Well, regardless of whether it's two weeks or five months or whatever it is, you still have to show adverse effects, isn't that right? That is correct. This appeal broadly presents two primary questions. The first concerns our conflicted counsel claim in which we have to show merely a plausible adverse effect from the conceivably conflicted prior counsel, in which case reversal is automatic because prejudice is presumed, and second, whether the trial court abuses discretion in failing to grant continuance to replacement counsel, Mr. Arlongate, so you can be adequately prepared for trial. The easiest and cleanest way of resolving this entire appeal is to focus on that first question concerning conflicted counsel. In our particular, one aspect of that right speaks to a simple, glaring, and bright-line rule in Sixth Amendment right to counsel law, namely the infringement on Ms. Shepherd's right to unconflicted counsel prior to trial, during plea bargaining. It is clear on this record, as many holes as it has, that the government knew Ms. Shepherd's defense counsel was conflicted and continued to engage in plea discussions with that conflicted counsel for the full five months immediately preceding trial. On this point, I want to make sure that counsel is aware of the Rule 28J letter I supplied, where Judge Willard offered an opinion about a year ago in describing the right to Sixth Amendment counsel to include bargains as precious, and we strongly agree with that, and think that's the basis to resolve this case. Just for my benefit, if you're focusing on plea bargaining, could you articulate what is the adverse effect? I mean, I certainly can imagine a lot of that, but just articulate what your argument is for what's the adverse effect of conflicted counsel during plea bargaining. Certainly. This record adequately, more than adequately, shows that the conflicted attorney at Papheon, while repeatedly and successfully obtained a plea bargain for Opara prior to starting representation for Ms. Shepherd. But then once he took over Ms. Shepherd's representation in February of 2018, the conflict became apparent to all at least as of April 4th. We think it actually started earlier, but we're limiting ourselves to the record. And as of April 4th, the record is clear that government's prosecutor, A. USA Ansari, repeatedly held plea discussions with a counsel that she knew was conflicted. She's the one who pointed out the conflicts as of April 4th. I refer the panel to the middle of page 10 of our opening brief, where we provide a long string citation to the record. Within that string citation, you will find two instances where, during a hearing on day three of the trial, where the trial court addressed the conflict, A. USA Ansari twice confirmed it was her understanding Ms. Shepherd was supposed to plead. That knowledge did not come from anywhere, from nowhere. It came from conflicted attorney at Papheon. And even more important, another part of the string citation there refers to docket number 158 in this case, which was the document Ms. Ansari prepared and filed with the district court to explain the government's position on the conflict. And at record on appeal, page 224, she again confirms that at Papheon had told her Ms. Shepherd was going to plead, and as close to a smoking gun as we're going to find in this kind of case, she goes on to explain that she emailed at Papheon numerous times during April and May of 2018. That is a period during which she knew he was conflicted, because again, the record's clear that's of April 4th. That's not even to discuss the proffer session that A. USA Ansari had with the only attorney formally charged with representing Ms. Shepherd. All of that shows that the government knew that Papheon was conflicted, knew that that conflict implicated Ms. Shepherd's pretrial plea bargaining interests, and tolerated that conflict and put itself in a position to benefit from that conflict in a way the Sixth Amendment right to counsel, in particular under the Supreme Court's Cuyler decision. I guess maybe my question wasn't phrased well. The conflict is conceded, actual conflict. My question is, do you have to show from the record that during plea bargaining the conflicted attorney did something that ordinarily the attorney would not have done, gave advice that the attorney would ordinarily not have given, didn't do something that she should have done because of the Our standard on the Sixth Amendment unclear to counsel claim does not require us to show actual prejudice. It does not require us to show likelihood of prejudice. We only need to show plausible prejudice. When you look at the conflicts between the two competing clients here, Papheon negotiated a plea negotiation, a plea deal for Opara, in which Opara could obtain sentencing relief by Opara was in no position to advocate for a plea deal for Ms. Shepherd, in which, for example, she would similarly provide inculpatory evidence against Opara, because his two clients' interests directly conflicted. That's a paradigmatic example of Sixth Amendment conflict. And again, requires a remedy, and under Cuyler, because we have a conceded conflict, and we have done a very strong showing of plausible adverse effects, that itself requires a reversal because prejudice is constitutionally presumed, and that's not even to talk about the adverse, plausible adverse effects we can show at trial, which were much more factually intensive and complicated. That's why we're urging the court to focus upon the infringement of our conflicted counsel right pre-trial during plea negotiations. My question, it's an adverse effect question, not as to plea bargaining, but at trial itself, which you were getting to. So the government argues at page, I think, 43 of its brief, that Ms. Shepherd can't show that she suffered adverse effect because her trial counsel performed comparably to the trial counsel of other defendants. And is that the right measuring stick? It's a relevant measuring stick. It's not the controlling measuring stick here. One of the difficulties of the situation the government created by failing to disclose the conflict is we have a very inadequately developed record here. One of the points to make on reply brief is the government's facile comparison of how replacement conflict plea counsel, Mr. Elonge, operated in decisions he made compared to other defense counsel doesn't work because Ms. Shepherd was not similarly situated to those other defendants. She was at the center of this conspiracy. She probably had the least direct inculpatory conduct. So a huge issue in this case is what was her knowledge about what was happening? In my reply... What is the right measuring stick for showing adverse effect at trial with poor performance of counsel? It continues to be plausibility and perhaps our strongest plausibility issue at trial concerns the inability Mr. Elonge had to subpoena physician assistants. The government takes advantage of the bind it has put us in by criticizing us for not showing on this appeal that physician assistants were actually licensed or what benefit we would have received from that. We had no ability to subpoena those physician assistants and our defense is not simply limited to showing that they were licensed. Given the knowledge prong of the crime to which Ms. Shepherd was convicted, if she can show she had a knowledge of the crime, because knowledge is a crucial element of the offense, that also suffices for a plausible adverse effect. If there's any doubt about whether the proper remedy is automatic reversal, at a minimum on this record, we're entitled to a remand to further develop the record on adverse effect and this circuit's infante decision teaches in that circumstance the requirement is to vacate Ms. Shepherd's conviction as well. Beyond that, I'll turn to our abuse of discretion issue unless there are any other questions. When was this case transferred to Judge Hittner and why was it transferred to Judge Hittner and I guess my last question is what did Judge Hittner, what was he I don't know how things operate in that court. I don't understand how Judge Hittner got an order entered onto the docket on Saturday, September 1st of the Labor Day weekend, but that's what happened. We know that. As to why he was transferred the case, the docket says upon agreement of all the other judges, we think we have an understanding of why, but all that is extra record. Yeah, no, I wasn't asking you to speculate. I just thought there might have been some reason why the case was transferred to him. Well, I can maybe be of some help on that. I don't know about this particular case, but it's well known in the Houston courthouse that Judge Hittner is extremely generous in making himself available, particularly in criminal cases and particularly in the more cases that involve perhaps more time and more complexity to assist the other judges if they need a judge who is available and willing to try it given his many years of experience. I think that is a situation that's generally accepted as working out very well in the Houston division. Again, I don't know about this specific case, but I strongly suspect that this was one of the many cases where Judge Hittner was available to help and did so, as you say, with the consent of the judges. I think that's likely. The problem we have is while expeditions of litigation is an absolutely valid concern and important concern in our system, we have to keep in mind the Supreme Court's warning endorsed by this circuit in the Alford case that a myopic insistence on proceeding to trial expeditiously could render the right to counsel a mere formality. And that's what happened here. In particular, I think there's a generous description about what happened in this case to describe Judge Hittner's interest in proceeding to trial as troublesome. One of the things that's absolutely clear in this record is he took the position that Mr. Elongate, a conflict-free counsel, did not need to be prepared for trial until his own defense case in chief. He did not need to be able to prepare in a prosecution's case in chief. That is frankly blatantly prejudicial in the Constitution and furthered the difficulty in which Mr. Elongate found himself here. How is the nature of the conflict explained to the new judge? Who did it and what was said? What does the record show? Much of the colloquy about the conflict, all of which occurred on the first court date, which was Tuesday, September 4th, after Judge Hittner was somehow assigned the case on the previous Saturday, he called the attorneys in for a pretrial hearing. During most of that pretrial hearing, most of the information about what was going on was presented to Judge Hittner by co-defense counsel. With Mr. Elongate not having an opportunity to do a lot of talking or relying upon a co-defense counsel, which is understandable in this situation, he was scrambling to get up-to-date, trying to comply with this circuit's mandate in cases like Uptate to do everything possible to prepare for trial, even in the face of time constraints. He cannot be faulted here for trying to understand North Carolina's discovery, understand the case's procedural history, understand the issues that were presented, and certainly not having an opportunity to do enough research to fully understand the undefended counsel issue and its implications. So, what's clear in the record is that between joint defense counsel and Mr. Elongate, the district court was clearly informed of the conflict. They were later told of PARA. Conceitedly, he was incorrectly told that the conflict would be resolved when PARA was excluded. But as I explained in our briefs, that didn't even make any sense because when the joint defense counsel conceded that point, that was moments after it was explained that a PARA's influence could extend to other evidence in the case, like other documents or the witnesses that the government obtained due to whatever information PARA gave them. I have a quick question on remedy. One remedy you asked for is for us to dismiss the indictment. But I didn't see any case law side of supporting that as a remedy. That is a fair contention. That is an issue as to which we're seeking an expansion of the law. We think it's justified based on the reasons that we provide. It is unfair here in the law. All right. Thank you. You saved time for about Mr. Adams. May it please the court. Anna O'Connell Adams for the United States. A couple of points that the United States would like to make first is that Shepard is not entitled to a new trial based on the conflict of interest held by her former counsel, Basia Papiam. That is the relief she asked for in her opening brief. In addition to dismissal of the indictment, the conflict was solved before trial. She went to trial with conflict free counsel and any complaints that she has about the unpreparedness of Mr. Elongate at the trial should be raised in a Section 2255 motion for ineffective assistance of counsel. With respect to the new relief sought in the reply brief, and I'm not even sure that she's asking to go back and redo plea bargaining in the opening brief. She was asking for a new trial based on Mr. Elongate's unpreparedness and dismissal of the indictment based on potentially tainted evidence presented to the grand jury in the reply brief. She asked. She brings up as a new adverse effect that she received ineffective assistance of counsel during plea negotiations with her conflicted counsel. And I think the idea is, although there's no record developed on this at all, that Mr. Papiam persuaded Ms. Shepard to go to trial so that Okpara could testify and get a sentencing benefit from the Eastern District of Texas. I think waiting until the reply brief to identify that as an adverse effect is way too late. And there's absolutely no mention of that being a potential adverse effect of this conflict anywhere until we get to the reply brief. So we haven't briefed what kind of a remedy would be available for that. I think under the Supreme Court's decision in Lafleur versus Cooper, if a plea was offered and counsel gave in, gave bad advice to reject the plea and go to trial. The remedy is to go back and reoffer the plea. There was no plea offer in this case. And so I'm not even sure what the remedy is here, given that she had a trial with conflict free counsel. If she did suffer some kind of a Sixth Amendment violation during plea negotiations, we think the proper course is to affirm the conviction, let her raise that in a Section 2255 motion. At bottom, it's a Sixth Amendment ineffective assistance of counsel claim, the claim that counsel was ineffective during plea negotiations. And this court's general rule is to save those for Section 2255 and not address them on direct appeal, except in the rare circumstance where a record has already been developed in the district court. And that's definitely not the case here. Ms. Shepard didn't make any record or flag this adverse effect in the district court at all and not in the opening brief either. It was only in the reply brief that she identified the adverse effect of a conflicted counsel giving her bad advice during plea negotiations. On to whether Ms. Shepard would be entitled to a new trial based on the conflict of interest held by her former counsel. There's no question we know that Mr. Akpafian had a multiple representation conflict. And under Kyler against Sullivan, to establish a Sixth Amendment violation based on a conflict of interest, the defendant has to show that the conflict exists and show that it adversely affected the lawyer's performance. Not just in general, some adverse effect that's proximately caused by the conflict. Here, Ms. Shepard got a new lawyer before the trial. That lawyer represented her without any kind of a conflict. And so to the extent that he was unprepared for trial, that is a general ineffective assistance. Isn't the court's focus in Kyler? Excuse me. I thought the court's focus in Kyler was on the adequacy of representation as a whole and not just on adequacy at trial. I don't think so. I think that in Kyler, the idea, the justification for the presumption of prejudice in Kyler is that if you go to trial with counsel that's operating under a conflict of interest, it's too difficult to judge the adverse effects that might flow from a counsel that has conflicting loyalties. And so the court doesn't require the defendant to show prejudice in those circumstances. But I think this court and other circuits have applied kind of a Kyler presumption of prejudice in pretrial conflict cases too. Yes. But I think in the opening brief, what our brief was focused on in responding to the arguments made in the opening brief, Ms. Shepard was arguing that she's entitled to a new trial with a presumption of prejudice. She's not going to try to show prejudice whatsoever. That she gets a presumption because she had a conflicted counsel before trial. But the adverse effect that she claimed flowed from that was that her new counsel, a conflict-free counsel, didn't have enough time to prepare for trial. And what we're saying is that's not the type of adverse effect that is entitled to the Kyler presumption of prejudice because that's not the type of adverse effect that's difficult to ascertain based on the conflict of interest. That's evaluated routinely under Strickland where the defendant has to show prejudice. In the opening brief, Shepard also argues that she's entitled to dismissal of the indictment based on the conflict. A couple of points there. We'll just reiterate the point from our brief that Shepard waived that argument. Both times that this was brought up at the trial, all three of the defense lawyers, including Alange, took the position that if Okpara's testimony was excluded, that that would remove any taint from McPafion's conflict. And they received a benefit from that concession or that argument in that Okpara's testimony was excluded. And so because she waived that argument in the district court, it's not reviewable by this court. And then two other points on that. The first is that there's not any evidentiary basis for the idea that Okpara somehow tainted the grand jury when it returned the second superseding indictment. We have testimony from McPafion saying he didn't share any information between the two clients. And then you can tell just by looking at the indictments, the second superseding indictment, the one that was returned after the conflict had been discovered, it added six new fraud claims against Ms. Shepard. But they were for six Medicare patients that were already known to the grand jury and had nothing to do with Mr. Okpara. He owned three home health agencies, Asset Health Services, Dynasty Healthcare, St. Mary's Healthcare. All of the people, all of the Medicare beneficiaries that were the subjects of the six fraud counts added against her were supposedly treated by different home health agencies, not any ones that Mr. Okpara owned or had any information about. Those six people were identified in previous iterations of the indictment in counts against the other two defendants. And then Shepard was added in to those later. And then finally, even if tainted information had been presented to the grand jury, which it wasn't, dismissal of the indictment wouldn't be warranted. An indictment that's valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of incompetent evidence. The Supreme Court has held that with respect to Fourth Amendment and Fifth Amendment tainted evidence presented to the grand jury in Calandra and Lawn. And then this court, you know, we cited in our brief this case, O'Connor's. It's a 1980 case from the Fifth Circuit. And the facts are pretty much on par with what happened here. The defendant contended that the government had improperly obtained a superseding indictment using information provided by a co-conspirator who they contended was an informant who was being paid by the government to spy on the defense in violation of the Sixth Amendment. And this court said, even assuming the information that counsel provided to the grand jury was obtained in violation of the Sixth Amendment right to counsel, its role in securing the superseding indictment provides no basis for finding the indictment invalid, citing Calandra. It's an old case, but it seems to be directly on point here. And in the reply brief, Shepard tries to make a new exception for the Sixth Amendment. I think it's already foreclosed by Fifth Circuit precedent. On whether there should be an evidentiary hearing here, I'll just address the couple of cases. There are a couple of cases where this court has sent an ineffective assistance of counsel claim back to the district court on direct appeal. Infante is the one that that my friend on the other side mentioned in his argument. That was a case where the defendant was convicted after a jury trial, where the council also represented some of the government's witnesses. And on direct appeal, this court remanded for further factual development on whether there was an adverse effect here. Of course, Shepard had conflict free counsel when she went to trial. There's another case called Salado where the court remanded. And these are both cases from like the early 2000s where the court remanded for an evidentiary hearing on direct appeal. In that case, the defendant had pleaded guilty without adequate warning that her counsel also represented one of her co-defendants. And the court said, let's go. Let's send it back to determine if there was an adverse effect because she had alleged some plausible ones there. No, no. If you I know you say adverse effect during plea bargaining has been waived, right? Because that was only brought up in a reply brief and evidently not argued below in any form. Is that right? That's right. But I don't think that if it weren't waived, it did. My point is, if it weren't waived, would it be appropriate to send it back for an evidentiary hearing to see if there was adverse effect during the plea bargaining when there actually was conflicted counsel? There is some precedent for this court doing that. Salado, I think, is the precedent for that. But there's another case. It's an unpublished case. So, you know, we didn't cite it. It's not it's not required to be followed. But it's called Reyes 609 Federal Appendix 260, where it was a similar situation. The defendant had pleaded guilty and then they realized on appeal that the federal public defender represented both the defendant and one of his co-defendants. And what the court did there was said this wasn't ever identified in the district court. There's no record developed on it. And this is a case from 2015. So it's more recent than those other ones. What we're going to do here is affirm the conviction. Give no opinion on whether this was a Sixth Amendment violation or ineffective assistance of counsel or whether the defendant can identify adverse effects. And we will let the defendant raise that in a Section 2255 motion. I think here there's no this was the ineffective assistance of counsel during plea negotiations just simply was never raised in the district court. There's not one speck of a record on that of what was happening during plea negotiations. I mean, there are some references to the idea that Ms. Shepard. When would it have been raised, I guess, given that the lawyer was actually conflicted during plea negotiations. So there's no way it wouldn't have been raised at that point. Well, I guess Mr. Alonge could have raised it. Once once she got new conflict free counsel, if that was what was happening, then that could have been flagged by her new counsel before they went to try. You know, if he wanted to say, look, I, I talked to her and now she wants to plead guilty or, you know, like there. Presumably he had some conversations with her about what she wanted to do and what advice the former lawyers had given to her. But it could have been raised by by him in the district court once the conflict was resolved. And again, it wasn't it wasn't raised in the opening brief either. And I think this court lacks any briefing on what the appropriate remedy would be, as we've mentioned before. I can move briefly to the continuance here. The this is the second main question, whether the district court abuses its discretion by not continuing the case. There's a list of factors. We've gone through them in our brief. And I know the court is familiar with those. And I'll just point out there are there are many that support not granting a continuance in this case or finding that it wasn't an abusive discretion to do so. Alonge potentially had more than three weeks to prepare for trial. At the very minimum, he had 10 days from the day he entered an appearance and everything was resolved with Ms. Shepard's payment until the opening arguments and 13 days until the government started putting on evidence on September 11th. The case had also been continued four times for a total of two years up to that point. And Ms. Shepard had been represented that whole time by various counsel that were presumably giving her some kind of advice or discussing the case with her. Again, there's not a record on any of that. And the government wouldn't be privy to any of that information. Mr. Alonge also introduced himself to the jury, told them that he had experience prosecuting health care fraud cases. That's one of the factors this court considers is the experience of the attorney with the alleged crime. And he explained to the jury that he was a former state prosecutor getting Medicare fraud money back for the state of Ohio, I believe it was. And then the adequacy of the defense provided at trial. We briefed this as part of the continuance motion. It's one of the factors. How did the defense counsel actually do? And, you know, if you read the trial transcript, Mr. Alonge provided a defense that was basically comparable to his co-defendants. He had a theory of the case that the home health agencies had hoodwinked her into using her legitimate medical practice at Amex in order to perpetrate their fraud scheme. He cross-examined witnesses that actually had something to say about Ms. Shepard. He skipped cross-examinations about witnesses that just said, I'm a Medicare beneficiary and I never met this doctor. And the other defense counsel made the same basic decisions that Mr. Alonge did. So it's certainly not a case where this defense counsel got up, had no idea what he was doing, and that it's obvious on the direct appeal that this continuance should have been granted. And then the final factor that weighs in our favor is the timeliness of the request. It was filed on September 6th, which is the day before the opening arguments were to start. At a pretrial conference two days earlier on September 4th, defense lawyers with Alonge there and caucusing with them represented to the court that he was ready to go to trial on September 10th, that they were good to go, that he couldn't start early, but he'd be ready to go by September 10th. The district court was aware that he had, after that, or at that September 4th conference, that this defense lawyer had only recently been added to the case and the conflict was discussed at that particular meeting. But the request was, after Alonge represented to the court on September 4th that he'd be ready to go, this motion came literally the day before the trial was supposed to start. And then also on the continuance, this court's precedents require a showing of prejudice. And Ms. Shepard has not even tried to explain what the prejudice is, what it was that Mr. Alonge would have done or should have done differently if he had more time to prepare. The only thing that's kind of flagged in the brief is he could have subpoenaed these foreign medical graduates to see what they told Ms. Shepard, that they were authorized or not. I think that, you know, that's within Ms. Shepard's knowledge if she had been told by the foreign medical graduates that were seeing the patients that they were actually authorized. It also makes no sense in terms of the context of the fraud scheme where Dr. Ramirez would come in at the end of the day and sign all of the things that the foreign medical graduates had put together. So I don't think she's made any kind of a showing of prejudice from the denial of the continuance motion. And for those reasons, unless the court has further questions, we ask that you affirm. All right, thank you, Ms. Adams. Mr. Arcella, you saved some time for rebuttal. Do you have a waiver problem with respect to adverse effect during plea bargaining? Do you have a waiver problem? The government is saying you've waived the argument. We don't, Your Honor. We point to pages 10 to 11 of our opening brief, pages 22 to 24, page 37, page 40. I concede we could have done more to more strongly present the issue, but the standard isn't whether we provide a heading for it. Page 37, we write, the Supreme Court has affirmatively recognized that adverse effects are difficult if not impossible to discern from the record, especially when, as here, the conflict implicates a plea bargain. That's the issue we are advancing on the reply in here. As well, Fifth Circuit precedent about waiver abandonment, those standards aren't met here. One standard I've seen applies where an issue raised in our reply brief is completely separate from the claims raised on opening argument. That doesn't apply, so we raise that. In 1990, Judge Smith offered an opinion, which I think is fair to paraphrase, that an argument does not even have to be made explicitly as long as it's essentially made.  The government's argument that there's no conflicted counsel issue here because Ms. Shepard was represented on day one of the trial by an unconflicted counsel cannot hold up for reasons that I explained, especially by reference to Paul v. Alabama in our reply brief. I'll move on unless there are any other questions given my short period of time to rebut. The government's argument that we need to somehow show that a plea bargain was, for instance, offered misunderstands the standard. We don't have to show an actual adverse effect or even a likely one, merely plausible. By analogy, for example, when you look at the plethora of conflict cases, a remedy is repeatedly given based, for example, on the possibility, plausible possibility, of what kind of questioning was no longer available at trial due to the conflict. By analogy, we meet that standard. We are not arguing for a new trial merely, as the government asserts. We're arguing for reversal. Whether a new trial happens after that, that's up to the government. On the unpreparedness factor, the government's argument that unpreparedness is not the type of adverse effect as to which prejudice is presumed is simply incorrect. It's not supported by any law, and for the reasons I explicate in our reply brief, it is absolutely incorrect when any analysis is applied to it. Prejudice is required showing, for example, when the government had no role in avoiding the error and could not have avoided the error. Here, we are hearing these circumstances because the government absolutely could have avoided it because it ignored its duty to report the conflict to the court five months ahead of trial. On the abuse of discretion issue, even if the court wants to apply the seven-factor test for Stallnacher, we ask that the court consider one factor from Alford, the case we think is more directly on point in part because it involves a right to counsel, which none of the government's precedents do, and that factor from Alford is, has there been a history of abusive continuances? There is no adequate record here to show there was a history of abusive continuances. Instead, again, we're here because the government covered up the conflict for five months until two weeks prior to trial. As for the Stallnacher factors, all of them support that there is an abuse of discretion. Right out of the gate, three out of the seven argue for an abuse of discretion in terms of, for example, the defendant's complicity in creating the problem, which the government concedes was minimal, in terms of the case complexity, and as to likelihood of prejudice. Beyond identifying likelihood of prejudice as a factor under Stallnacher, the government is silent about it, therefore should begin to concede it. Even if the court wants to look at it on the merits, the likelihood of prejudice was extreme in this case, particularly given the trial court was directly informed, Mr. Arlonga had not even had a chance to complete discovery review, and given the propensity the trial court had to rush towards trial. As for timeliness of continuance, it is undeniable in this record. Mr. Arlonga had no ability to seek a continuance prior to Tuesday, August 28th, when he filed his formal appearance. That left him six court days to seek a continuance. He cannot be faulted for choosing to prioritize this circuit's instruction to try and prepare for trial, given everything else he was doing, and frankly, it's just splitting hairs to try and make an assessment of whether the continuance motion was timely, either on Tuesday the 4th, or the preceding three days, Wednesday to Friday at the end of August. Thank you very much. Thank you, Mr. Arcila. The case is under submission.